UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| JILLETTA L.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:23-cv-00021-KMB-JMS |
| | ) | |
| MARTIN J. O'MALLEY,[2] | ) | |
| | ) | |
| Defendant. | ) | |

## **ENTRY REVIEWING THE COMMISSIONER'S DECISION**

Plaintiff Jilletta L. applied for disability insurance benefits and supplemental security income from the Social Security Administration ("SSA") on May 11, 2020, alleging an onset date of February 21, 2020. [Dkt. 10-2 at 18.] Administrative Law Judge Jessica Hodgson (the "ALJ") issued a decision on August 3, 2022, concluding that Jilletta was not disabled and therefore not entitled to receive disability benefits. [*Id.* at 18-45.] The Appeals Council denied Jilletta's request for review on December 21, 2022. [*Id.* at 2-4.] On February 10, 2023, Jilletta timely filed this civil action asking the Court to review the denial of benefits according to 42 U.S.C. § 405(g) and 28 U.S.C. § 1361. [Dkt. 1.]

---

[1] To protect the privacy interests of claimants for Social Security benefits, and consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first names and last initials of non-governmental parties in its Social Security judicial review opinions.

[2] Pursuant to Federal Rule of Civil Procedure 25(d), Martin J. O'Malley automatically became the Defendant in this case when he was sworn in as Commissioner of the Social Security Administration on December 20, 2023, replacing Acting Commissioner of the Social Security Administration Kilolo Kijakazi.

## I.  STANDARD OF REVIEW

"The Social Security Administration (SSA) provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1151 (2019).  Disability is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018) (citing 42 U.S.C. § 423(d)(1)(A)).

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision.  *Stephens*, 888 F.3d at 327.  "[S]ubstantial evidence" is "evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154).  "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens*, 888 F.3d at 327.  Reviewing courts also "do not decide questions of credibility, deferring instead to the ALJ's conclusions unless 'patently wrong.'" *Zoch*, 981 F.3d at 601 (quoting *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017)).  "[E]ven under deferential standard of review for social security disability cases, an [ALJ] must provide a logical bridge between the evidence and [the] conclusions." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022) (internal quotations omitted).

The SSA applies a five-step evaluation to determine whether the claimant is disabled. *Stephens*, 888 F.3d at 327 (citing 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).  The ALJ must evaluate the following, in sequence:

2

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), *as amended* (Dec. 13, 2000) (citations omitted). "If a claimant satisfies steps one, two, and three, she will automatically be found disabled. If a claimant satisfies steps one and two, but not three, then she must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

After Step Three, but before Step Four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id*. The ALJ uses the RFC at Step Four to determine whether the claimant can perform her own past relevant work and if not, at Step Five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (v).

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. *Stephens*, 888 F.3d at 327. When an ALJ's decision does not apply the correct legal standard, a remand for further proceedings is usually the appropriate remedy. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021). Typically, a remand is also appropriate when the decision is not supported by substantial evidence. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

## II.  RELEVANT BACKGROUND

Jilletta was 46 years old when she applied for disability benefits.  [Dkt. 10-2 at 18; dkt. 10-3 at 2.]  She completed a college program to become a licensed practical nurse and previously worked as a licensed practical nurse, a receptionist, and a short order cook.[3]  [Dkt. 10-2 at 60-67; dkt. 10-3 at 43.]

The ALJ followed the five-step evaluation set forth by SSA in 20 C.F.R. § 404.1520(a)(4) and concluded that Jilletta was not disabled.  Specifically, the ALJ found as follows:

- At Step One, Jilletta had not engaged in substantial gainful activity since February 21, 2020.  [Dkt. 10-2 at 20.]

- At Step Two, Jilletta had the following severe impairments:  mild diffuse cervical spondylosis with multiple bulging discs, mild to moderate foraminal stenosis, and moderate herniation; spondylotic spurring with canal narrowing and cord flattening of the cervical spine; mild disc bulges and mild facet hypertrophy of the lumbar spine; mild spondylotic spurring and small disc extrusion of the thoracic spine with mild cord flattening; capsulitis of the foot; toe discoloration; hallux abductovalgus; polymyalgia; connective tissue disease; Ehlers-Danlos syndrome; migraine disorder; mild Chiari I malformation; brain lesion; status post-embolization of left artery aneurysm status-post LICA surpass flow diverting stent with incongruent binasal defect secondary to bilateral ophthalmic artery aneurysms; anxiety disorder; depression; sleep disorder; and posttraumatic stress disorder.  [*Id.* at 20-21.]

- At Step Three, Jilletta did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  [*Id.* at 22-23.]

- After Step Three but before Step Four, Jilletta had the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except not going to be off task or away from the workstation but has an option to alternate to standing for three minutes after every thirty minutes of sitting; alternate to sitting for five minutes after every thirty minutes of standing; alternate to sitting for five minutes after every thirty minutes of walking; can frequently operate foot controls bilaterally; can operate handle controls frequently bilaterally; frequently reach overhead and in all other directions bilaterally; frequently handle items bilaterally; frequently finger bilaterally; frequently feel bilaterally; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, and crawl; frequent near acuity, fair acuity, depth perception, field of vision, and accommodation; can work at unprotected heights and moving mechanical parts

---

[3] The relevant evidence is set forth in the Parties' briefs and need not be repeated here.  Specific facts relevant to the Court's disposition of this case are discussed below.

    occasionally; can perform simple, routine tasks; is able to perform simple work-related decisions; frequent interaction with coworkers, supervisors, and the public." [*Id.* at 27.]

- At Step Four, Jilletta was unable to perform any past relevant work.  [*Id.* at 43.]

- At Step Five, relying on testimony of the vocational expert ("VE"), and considering Jilletta's age, education, and RFC, there were jobs that existed in significant numbers in the national economy that Jilletta could have performed through the date of the decision, including Information Clerk, Assembly – Bench Table, and Packing – Bench Table. [*Id.* at 44.]

### III.  DISCUSSION

Jilletta claims that the ALJ erred in five ways: (1) by finding that 8,500 jobs in the national economy constitutes a significant number; (2) by failing to build a logical bridge from the evidence to Jilletta's RFC; (3) by omitting supported limitations from the state agency medical consultants; (4) by improperly evaluating Jilletta's migraines; and (5) by conducting an improper subjective symptom analysis. [Dkt. 12 at 2.]  The Court begins with Jilletta's claim that the ALJ improperly evaluated her migraines, which the Court finds to be dispositive of this case.

#### A.  Subjective Symptom Analysis of Migraine Headaches

Jilletta argues that the ALJ improperly discounted the intensity, persistence, and limiting effects of her migraine headaches in two ways.  First, the ALJ allegedly erred by finding that Jilletta's testimony was inconsistent with the fact that she waited six months to pursue Botox treatments after first discussing Botox with her neurologist.  [Dkt. 12 at 25.]  Second, the ALJ allegedly erred by finding that Jilletta made inconsistent statements about the effectiveness of emergency room treatment for acute migraines.  [*Id.* at 26.]

In response, the Commissioner argues that the ALJ reasonably found that Jilletta would have pursued Botox treatments more quickly if her migraines had been as severe as she alleged.  [Dkt. 14 at 8.]  The Commissioner also argues that Jilletta's claim that emergency room treatment was ineffective for acute migraine headaches is inconsistent with an emergency room treatment

5

note from March 2020 showing that treatment Jilletta received at the emergency room alleviated her headache pain. [*Id.* at 7, 8-9.]

In reply, Jilletta argues that she sought Botox treatments after multiple medications were ineffective and that her persistent attempts to obtain relief through increasing dosages, changing medications, trying new treatments, and having appointments with specialists are all consistent with her description of the severity, persistence, and limiting effects of her migraines. [Dkt. 18 at 8.] She also argues that the ALJ unreasonably discounted her reason for only going to the emergency room one time for migraines, namely, that spending hours at a noisy and bright hospital actually aggravated her symptoms. [*Id.* at 8-9.]

SSR 16-3p instructs the ALJ to apply a two-prong test to weigh the claimant's subjective symptoms. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." SSR 16-3p, 2017 WL 5180304 at *2; *see also* 20 CFR § 416.929. Second, if such an impairment is found, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." SSR 16-3p, 2017 WL 5180304 at *3. If there is a conflict between the plaintiff's description and the objective medical evidence presented, the ALJ must consider "other relevant evidence in the individual's case record" to resolve the conflict. *Id.* at *4; *see also Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("Although a claimant can establish the severity of his symptoms by his own testimony, his subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record.").

An ALJ's subjective symptom evaluation is a credibility determination entitled to special deference and will be reversed only if patently wrong. *Burmester v. Berryhill*, 920 F.3d 507, 510

(7th Cir. 2019). "In determining credibility an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations." *Villano*, 556 F.3d at 562 (citing 20 C.F.R. § 404.1529(c)).

At the administrative hearing, Jilletta testified that she experiences debilitating migraines every day. [Dkt. 10-2 at 67.] These migraines typically last anywhere from one to five hours. [*Id.* at 68.] When Jilletta gets a migraine, it is helpful for her to lay down or cover her eyes. [*Id.*] She testified that she takes the maximum dose of Topamax every day, as well as a second medication prescribed by her neurologist and Synergan to stop from vomiting. [*Id.* at 67.]

Jilletta's medical records also indicate that she experiences daily migraines and corroborate her testimony about her migraine medication. [*See, e.g.* dkt. 10-8 at 333 (March 16, 2020, family medicine appointment: "Pt still ha[s] severe headache at all times = 5/10. Vomiting over the weekend"); *id.* at 464 (May 8, 2020, neurology appointment: "She describes her migraines located behind her eyes, top of her head and all over head and back of her head with stabbing and throbbing quality which she rates as 10/10 . . . most severe with associated light and sound sensitivity along with nausea and vomiting. The headaches can last from a few hours up to 4 days in duration. She has migraines at least 3 days per week"; increases dosage for Topamax.); *id.* at 356 (January 25, 2021, family medicine appointment: "She states that her head feels like it is going to explode. She is in pain all the time."); *id.* at 470 (May 12, 2021, neurology appointment: "The patient presented this time with severe headache and the room ha[d] to be darkened for examination."); dkt. 10-8 at 424 (August 3, 2021, neurology appointment: noting that Jilletta takes Topamax and Fioricet for migraines without improvement); dkt. 10-9 at 375 (February 27, 2022, neurology appointment: "patient returns to clinic for f/u on migraines. Has them 'everyday'").] Further, it is undisputed that Jilletta has a mild Chiari I malformation, which is known to cause headaches. *See Goins v.*

7

*Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (noting that "headaches are the classic symptom of Chiari malformation").

The ALJ found that Jilletta's medically determinable impairments could reasonably be expected to cause the alleged symptoms but that her statements concerning the intensity, persistence, and limiting effects of her migraine symptoms was not entirely consistent with the medical evidence and other evidence in the record. [Dkt. 10-2 at 29-30.] In reaching this conclusion, the ALJ found that Jilletta "has gaps in care one would not expect if the alleged severity of her migraines were as severe as she alleged. In particular, Botox injections were discussed with her in August 2021, but she waited about six months until February 2022 to try to get those injections." [Dkt. 10-2 at 41.] She also found that Jilletta "claimed she had only gone to the emergency room once for her headaches because despite being given medications at the hospital her head still hurt so she would never go the emergency room for headaches again. However, the hospital records showed that her headache did improve when given medication at the emergency room." [*Id.* at 42 (internal citation omitted).]

The Court has reviewed the medical record and determined that the ALJ committed reversible error in making these inconsistency findings. Jilletta's medical records do not support a finding that she had "gaps in care" with respect to migraines. As described above, Jilletta had frequent medical appointments for migraines with both family medicine providers and neurological specialists. The ALJ focused on the fact that Botox treatments were discussed with Jilletta in August 2021 but that she did not try to obtain Botox treatments until a neurology appointment in February 2022. [Dkt. 10-8 at 468 (August 3, 2021, neurology appointment: "Patient was introduced on possibility of Botox injection."); dkt. 10-9 at 375 (February 21, 2022, neurology appointment: "Patient has history of multiple failures to several migraine medication

8

and will try to obtain preauthorization for Botox injection.").] However, the ALJ did not question Jilletta at the hearing about why she waited to pursue Botox treatments until February 2022 and thus failed to determine whether Jilletta had a legitimate reason for waiting to pursue Botox treatments that was not inconsistent with her testimony. There are numerous reasons that a patient might not comply with or seek additional treatments, such as side effects, cost, religious beliefs, and other factors. *See* SSR 16-3p, 2017 WL 5180304 at 9-10*. For this reason, the ALJ may not discredit a claimant's testimony about her subjective symptoms on the basis of gaps in care "without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." *Id.* at *9. Thus, while "a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) (remanding where the ALJ failed to question the claimant about gaps in treatment). The ALJ's failure to question Jilletta about her decision to pursue Botox treatments violates SSR 16-3p, and she erred by discrediting Jilletta's testimony on the basis of her supposed hesitance to pursue Botox treatments.

The ALJ's second inconsistency finding is also not supported by the medical record. Jilletta answered a question on an SSA Headache Questionnaire about whether she goes to the emergency room when she has a migraine:

> I usually can't bear the thought of a noisy/bright ER, so I stay home and suffer through it. My last ER visit for a migraine was March 2020 at IU Health Bedford, IN. They gave me enough meds to knock out a horse and my head still hurt. So I never want to do that again!

[Dkt. 10-6 at 77 (cleaned up).] The ALJ found that this statement was inconsistent with the emergency room record from March 16, 2020. [Dkt. 10-2 at 42.] The emergency room record shows that Jilletta arrived at the emergency room in Bedford with a migraine at 12:51 p.m. on

9

March 16, 2020. [Dkt. 10-7 at 258.] She told the medical staff that her migraine had begun about two weeks earlier, shortly after she underwent neurosurgery to embolize a brain aneurysm. [*Id.* at 266.] The medical staff administered Haldol, Benadryl, and a steroid taper. [*Id.* at 267.] About four and a half hours after she arrived at the emergency room, Jilletta reported that her headache "fe[lt] better." [*Id.*] But despite some improvement, it is clear from the treatment notes that Jilletta's migraine was still active. The emergency room doctor noted that Jilletta "is not a candidate for DHE[4] d/t her aneurysm treatment . . . unfortunately could not improve her condition more definitively, and explained this to the patient." [*Id.*] In making the inconsistency finding, the ALJ did not mention Jilletta's statement about the aggravating effects of sitting in a bright and noisy emergency room or the emergency room doctor's note indicating that Jilletta was still in pain and that he was unable to pursue additional treatments because of her history of brain aneurysms.

Given these circumstances, the Court concludes that the ALJ erred by finding that Jilletta's answer on the Headache Questionnaire was inconsistent with the March 16, 2021, emergency room record. Jilletta stated that going to the emergency room aggravates her headaches because it is bright and noisy and that the last time she went to an emergency room for a migraine, she received a lot of medication but still had a migraine at the end of the visit. The medical record from that visit corroborates her statement. It shows that Jilletta spent hours in an emergency room and that despite receiving Haldol, Benadryl, and a steroid taper, her headache persisted. Even though her headache was somewhat less painful several hours later, it remained severe enough that the emergency room doctor considered additional treatments that were unfortunately foreclosed by

---

[4] Dihydroergotamine Infusion, or DHE, is a treatment for active migraine headaches that carries a risk of heart attack and stroke. *See* https://www.barrowneuro.org/treatment/dihydroergotamine-infusion/#:~:text=Dihydroergotamine%2C%20or%20DHE%2C%20is%20a,headaches%20and%20in%20cluster%20headaches (last visited March 12, 2024).

Jilletta's other pre-existing conditions. No reasonable factfinder could find that Jilletta's answer on the Headache questionnaire was inconsistent with her emergency room record. The Court concludes that the ALJ's inconsistency finding was patently wrong, and she erred by relying on this supposed inconsistency to discredit Jilletta's testimony about the severity, persistence, and limiting effects of her migraines.

In sum, Jilletta's medical records support her testimony about the severity, persistence, and limiting effects of her migraines. The ALJ's inconsistency findings were patently wrong because she relied on the fact that Jilletta waited six months before pursuing Botox treatments but failed to question Jilletta at the hearing about her reasons for waiting, in violation of SSR 16-3p. Further, no reasonable factfinder could find that Jilletta's answer on the SSA Headache Questionnaire was inconsistent with her March 2020 emergency room medical record. These errors require the Court to reverse the ALJ's decision and remand for further proceedings.[5]

### B. Other Issues

Because the Court finds remand to be necessary on the grounds set forth above, it will not address Jilletta's other arguments. Jilletta may raise her other concerns on remand if she deems it appropriate to do so.

### IV. CONCLUSION

For the reasons stated above, the Court **REVERSES** the Commissioner's decision denying Jilletta L. benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence 4). Final judgment shall issue accordingly.

**So ORDERED**.

---

[5] Jilletta also argues that the ALJ erred by discrediting the expert medical opinion of Nurse Practitioner Cheryl Hock with respect to the limiting effects of her migraines. [Dkt. 12 at 24-25.] Because the Court reverses on the basis of the ALJ's erroneous subjective symptom analysis, it need not consider this other issue.

Date: 3/15/2024

*Kellie M. Barr*

Kellie M. Barr
United States Magistrate Judge
Southern District of Indiana

Distribution:

Cody Thomas Marvin
Marvin & Associates, P.C.
maisha@marvin.law

Drew Meyer
Social Security Administration
drew.meyer@ssa.gov

Catherine Seagle
Social Security Administration
catherine.seagle@ssa.gov

Julian Clifford Wierenga
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
julian.wierenga@usdoj.gov